IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 01 2006

LUTHER D. THOMAS, Clerk
By:
Deputy Clerk

CHARLES BYTHEWOOD,

        Plaintiff,

v.

UNISOURCE WORLDWIDE, INC.,

        Defendant.

CIVIL ACTION NO.

1:04-CV-1512-JEC

## ORDER AND OPINION

    This case is presently before the Court on defendant's Motion for Summary Judgment [67], plaintiff's Motion for Contempt [63], plaintiff's Motion for Sanctions [84], defendant's Motion for Leave to File Sur-Reply [85], and defendant's Motion for Oral Argument and for Sanctions [107]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Summary Judgment [67] should be **DENIED**, plaintiff's Motion for Contempt [63] should be **GRANTED in part** and **DENIED in part**, plaintiff's Motion for Sanctions [84] should be **DENIED**, defendant's Motion for Leave to File Sur-Reply [85] should be **GRANTED**, and defendant's Motion for Oral Argument and for Sanctions [107] should be **DENIED**.

AO 72A
(Rev.8/82)

**BACKGROUND**

This is a Fair Labor Standards Act retaliation case. Defendant Unisource Worldwide, Inc. ("Unisource") markets and distributes commercial printing and business imaging papers, packaging systems, and facility supplies and equipment. (Def.'s Statement of Material Facts ("DSMF") [67] at ¶ 1.) Plaintiff began working in Unisource's recruiting department in October, 2001. (Pl.'s Statement of Material Facts ("PSMF") [92] at ¶ 1.) Initially, defendant hired plaintiff as Team Leader of Talent Acquisition. (DSMF at ¶ 2.) In July, 2003, defendant promoted plaintiff to Manager of Talent Acquisition. (*Id.* at ¶ 3; Pl.'s Resp. to DSMF [91] at ¶ 3.) In both positions, plaintiff's primary responsibilities were to: 1) recruit candidates for employment with Unisource; and 2) manage a team of recruiters, including John Stevens, Michael Castardi, Vera Ciminillo, Carrie Flor, Chris Harvey, and Claire Marlin. (DSMF at ¶ 4.) With the exception of Marlin, all of the recruiters that plaintiff managed were employed by Encadria Staffing Solutions, Inc. ("Encadria") and assigned to Unisource on a contract basis. (*Id.* at ¶ 5.)

When plaintiff began managing the contract recruiters, Encadria classified them as hourly, non-exempt employees. (DSMF at ¶ 8; Pl.'s Resp. to DSMF [91] at ¶ 8.) Accordingly, the recruiters billed Unisource by the hour for their services, and were entitled to overtime pay at the rate of one and one-half times their normal

2

billable rate when they worked more than forty hours in any particular week. (DSMF at ¶ 8.) The recruiters submitted weekly timesheets to plaintiff for his approval. (*Id.* at ¶ 7.)

Unisource hired Amy Ivers as Director of Talent Acquisition on September 8, 2003. (DSMF at ¶¶ 16-17.) As Director, Ivers was plaintiff's supervisor. (*Id.* at ¶ 16.) Shortly after coming to work for Unisource, Ivers began to question the necessity of paying the contract recruiters for overtime. (PSMF at ¶ 9.) The parties do not dispute that Ivers asked plaintiff to investigate Unisource's ability to change the contract recruiters' status to exempt, so that Unisource would not be required to pay time and a half if they worked overtime. (DSMF at ¶¶ 18, 21.) Plaintiff contends that Ivers also instructed him to immediately eliminate overtime pay. (PSMF at ¶ 13.) In addition, plaintiff asserts that in several conversations beginning on November 11, 2003, Ivers directed plaintiff to ensure that the recruiters only record forty hours on their timesheets, regardless of whether they in fact worked overtime.[1] (*Id.* at ¶¶ 46-54.) During their conversation on November 11th, plaintiff informed

---

[1] The evidence concerning the substance of Ivers' directive to plaintiff on November 11th and in subsequent conversations is in dispute. (*See* PSMF [92] at ¶¶ 44-54, and Def.'s Resp. to PSMF [109] at ¶¶ 44-54.) In deciding defendant's motion for summary judgment, the Court construes the facts in the light most favorable to plaintiff. *See Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988).

3

Ivers that he thought it was illegal to ask a non-exempt contractor to work more than 40 hours a week and not bill for it. (*Id.* at ¶ 53.)

According to plaintiff, his relationship with Ivers changed immediately following the November 11th meeting. (PSMF at ¶ 58.) Prior to November 11th, plaintiff felt that he had a good working relationship with Ivers and that she treated him fairly. (*Id.* at ¶ 8.) Plaintiff contends, however, that as soon as he challenged Ivers' pay practices, she began to complain about his performance. (*Id.* at ¶¶ 58-60.) Specifically, plaintiff claims that during the November 11th meeting, Ivers, for the first time, questioned plaintiff's leadership skills and suggested that he should not be in management. (*Id.*)

In a series of emails over the course of several weeks following November 11th, Ivers stated that plaintiff had misunderstood her instructions. (PSMF at ¶¶ 65-67.) In her emails, Ivers explained that she only wanted plaintiff to monitor the recruiters' productivity, and to investigate how to change their status to exempt. (*Id.*) Plaintiff contends, however, that Ivers' verbal directives differed from her written instructions. (*Id.* at ¶ 71.) According to plaintiff, Ivers continued to instruct him to limit the recruiters to billing forty hours, even when they worked overtime, and plaintiff continued to object to this policy. (*Id.* at ¶¶ 71-82.)

4

Plaintiff told Unisource's in-house counsel, Jenny Williams, and human resources director, Virgil Bird, that Ivers had asked him to illegally refuse to pay recruiters for the overtime that they worked. (*Id.* at ¶¶ 84-99.)  According to plaintiff, Williams agreed to talk to Ivers, but did not thoroughly investigate the matter.  (*Id.* at ¶¶ 92-93.)  Bird warned plaintiff that if he did not follow Ivers' directive, whether legal or illegal, she would probably try to "get rid of [him]."  (*Id.* at ¶ 96.)

Plaintiff and Ivers discussed the overtime issue again in late November and early December, 2003.  (PSMF at ¶¶ 140-144.)  According to plaintiff, Ivers confirmed during these discussions that she would not pay recruiters overtime, even if they were required to work more than forty hours during a particular week.  (*Id.* at ¶¶ 142, 144.) Plaintiff again objected to Ivers' pay practices, which he believed were illegal.  (*Id.* at ¶ 141.)

Approximately a month later, on January 19, 2004, plaintiff interviewed Raja Green, a candidate for a recruiting position at Unisource.   (PSMF at ¶ 152.)   The parties dispute the facts surrounding the Green interview.  Defendant contends that plaintiff was "rude, negative, condescending, unprofessional and volatile" during this interview.  (DSMF at ¶ 59.)  Defendant also claims that plaintiff criticized Unisource during the interview.  (*Id.* at ¶ 62.) Apparently Green complained to Ivers about his interview, telling her

that it was "the worst interviewing experience" he had "ever had." (*Id.* at ¶ 58.)  Plaintiff disputes this characterization of the Green interview.  (PSMF at ¶ 152.)  He claims that the interview was not negative, and that he appropriately questioned Green about his skill set and job history, and, also appropriately, corrected a spelling error on Green's resume.  (*Id.*)

According to defendant, after receiving Green's complaint, Ivers questioned other members of Unisource's recruiting department about their interviews with plaintiff.  (DSMF at ¶ 68.)  Defendant claims that after questioning other employees, Ivers discovered that plaintiff had conducted himself inappropriately in previous interviews, including his interviews with Unisource employees Leslie Beaty and Pat Myrick, and Unisource candidate Don Rearic.  (*Id.* at ¶¶ 68-72.)  Again, however, the evidence concerning these interviews is in dispute.  The employees' testimony concerning their interviews with plaintiff is equivocal at best.  In their depositions, Beaty and Myrick do not characterize their interviews as negative.  (Myrick Dep. at 31, 38, and 40; Beaty Dep. at 9-12.)  In addition, Rearic has filed an affidavit in this case stating that he liked plaintiff and never complained about his interviewing style.  (Rearic Aff. [92] at ¶¶ 3-4.)

On January 20th, Ivers spoke to Human Resources Director Gary Melampy concerning Ivers' desire to terminate plaintiff's employment

6

as a result of the alleged poor interviews and other performance issues. (DSMF at ¶ 68, 74.) Specifically, Ivers informed Melampy that she wanted to terminate plaintiff as a result of: 1) the Green interview, and information she learned after the Green interview concerning plaintiff's interviews with Myrick, Beaty, and Rearic; and 2) plaintiff's "poor decision-making ability" and "inability to think strategically." (DSMF at ¶¶ 79-80.) Later that day, Ivers and Melampy met with plaintiff to discuss these issues. (*Id.* at ¶ 74.) At the conclusion of the meeting, Ivers and Melampy asked plaintiff to leave for the day and meet with them again the next morning. (*Id.* at ¶ 77.)

When plaintiff arrived at work the next morning, he saw that his office had been cleaned out, and all of his files removed, including the contract recruiters' time sheets. (DSMF at ¶ 82; PSMF at ¶ 194.) Shortly after his arrival, plaintiff met with Melampy, and told Melampy that he thought he was being terminated because of his opposition to Ivers' illegal pay policy. (DSMF at ¶ 83; PSMF at ¶ 195.) Melampy placed plaintiff on paid leave while he investigated Ivers' motivation for the termination decision. (DSMF at ¶ 86.) Melampy ultimately concluded that plaintiff's retaliation charge was unfounded. (*Id.* at ¶ 93.) He met with plaintiff on January 28, 2004, to advise plaintiff of the outcome of the investigation, and to inform him that Ivers' termination decision would stand. (*Id.* at ¶

7

94.)   Plaintiff remained on the payroll until defendant officially terminated his employment on February 6, 2004.  (*Id.*)

Plaintiff subsequently filed this lawsuit pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* (Compl. [1].) In his one-count Complaint, plaintiff alleges that defendant terminated him in retaliation for his complaints about Ivers' FLSA violations.  (*Id.* at ¶ 1.)  Defendant has filed a motion for summary judgment on plaintiff's FLSA claim. (Def.'s Mot. for Summ. J. [67].) Defendant has also filed a motion for sanctions.  (Def.'s Mot. for Sanctions [107].)  Plaintiff has filed a motion for sanctions and a motion for contempt.  (Pl.'s Mot. for Sanctions [84]; Pl.'s Mot. for Contempt [63].)  All of these motions are now before the Court.

## DISCUSSION

### I.   Defendant's Motion for Summary Judgment

#### A.   Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."" FED. R. CIV. P. 56(c).  A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue

AO 72A
(Rev.8/82)

is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. While

AO 72A
(Rev.8/82)

the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

**B.    Plaintiff's FLSA Claim**

Section 15(a)(3) of the FLSA, 29 U.S.C. § 215(a)(3), prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against" an employee because the employee has opposed or complained about a practice that is unlawful under the statute. *E.E.O.C. v. White and Son Enter.*, 881 F.2d 1006, 1010 (11th Cir. 1989); *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342 (11th Cir. 2000.) In order to establish a *prima facie* case of retaliation under Section 15(a)(3), plaintiff must demonstrate that: 1) he engaged in activity protected by the FLSA; 2) he subsequently suffered an adverse employment action; and 3) the adverse action was causally related to his protected activity. *Wolf*, 200 F.3d at 1342-43. Once plaintiff makes out a *prima facie* case, the burden of production[2]

---

[2]    "This is not a shift in the burden of persuasion but simply requires the employer to present evidence to explain its actions." *Thurman v. Robertshaw Control Co.*, 869 F. Supp. 934, 939 (N.D.Ga. 1994) (O'Kelley, J.). "If successful, the employer

shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* at 1343. *See also, McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). If defendant makes the necessary proffer, the burden once again shifts to plaintiff to show that the stated grounds are merely a pretext for retaliation. *Wolf,* 200 F.3d at 1343. *See also, Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (citing *Burdine*, 450 U.S. 248).

### 1.   Plaintiff's *Prima Facie* Case

Defendant does not dispute that plaintiff suffered an adverse employment action as a result of his termination on February 6, 2004. (*See* Def.'s Br. in Supp. of its Mot. for Summ. J. ("Def.'s Br.") [67].) Defendant argues, however, that plaintiff did not engage in activity protected by the FLSA, and, alternatively, that plaintiff's termination was not causally related to his protected activity. (*Id.*) Contrary to defendant's argument, the Court finds that plaintiff has presented sufficient evidence that he engaged in protected activity, and that his termination was related to that activity, to survive summary judgment.

---

defeats the presumption of intentional discrimination created by the *prima facie* case." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

11

AO 72A
(Rev.8/82)

a)   **The record contains sufficient evidence that plaintiff engaged in protected activity to defeat summary judgment.**

A plaintiff engages in "protected activity" when he protests or complains about an employer's conduct that he reasonably believes is unlawful under the FLSA. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). This element of plaintiff's claim has an objective and a subjective component; that is, plaintiff "must not only show that he subjectively . . . believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable." *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). The objective reasonableness of plaintiff's belief is "measured against existing substantive law." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). Plaintiff need not file a formal complaint to establish "protected activity;" unofficial complaints suffice as long as the objective and subjective requirements are met. *White and Son Enter.*, 881 F.2d at 1011.

The recruiters plaintiff managed at Unisource were classified as hourly, non-exempt employees during the relevant time period. (DSMF at ¶ 8.) Accordingly, under the FLSA, these employees were entitled: 1) to bill for all of the hours that they worked; and 2) to be paid at one and one-half times their regular rate for all hours that they worked in excess of forty hours in any particular

AO 72A
(Rev.8/82)

week.   See 29 U.S.C. § 207 (a)(1)(2004)(prohibiting "a workweek longer than forty hours unless [the employee] receives compensation for his employment . . . at a rate not less than one and one-half times [his] regular rate").   There is ample evidence in the record that Ivers occasionally required the contract recruiters to work overtime, but refused to allow them to bill for that time.   (See PSMF at ¶¶ 47-49; 51-55; 71, 75, 80, 100-102.)   Under Ivers' alleged policy, the employees not only failed to receive time and a half for their overtime; they also failed to receive any payment at all for hours worked in excess of forty, because Ivers prohibited them from billing for more than forty hours in any particular week.   (Id.) Plaintiff, and several other Unisource employees, testified to Ivers' policy of requiring, but not paying for, overtime.   (Id. at ¶¶ 51-55, 80, 102, 107-111, 118.)

Furthermore, there is evidence in the record that plaintiff complained about Ivers' apparently unlawful policy of requiring, but refusing to pay for, overtime to hourly, non-exempt employees.   (See PSMF at ¶¶ 49, 53, 79.)   Assuming plaintiff's testimony is true, plaintiff directly stated to Ivers, on more than one occasion: "What you're asking me to do is illegal."   (Id. at ¶¶ 79.) Plaintiff also complained to Unisource human resources director Virgil Bird, and Unisource in-house counsel Jenny Williams.   (Id. at ¶¶ 95-98.)   Although Ivers has testified that plaintiff

13

misconstrued her directive, which she contends was simply to monitor the recruiters' productivity and investigate ways to change their status from non-exempt hourly employees to exempt salaried employees, there is sufficient evidence in the record to raise a question of fact on this issue.

In its motion for summary judgment, defendant asserts that "it is not clear from the record what exactly Plaintiff claims was his protected activity," but that plaintiff "apparently contends that his . . . disagreement with Ivers over the exemption status of [the] contract recruiters and the resulting loss of overtime compensation for those individuals constitutes protected activity." (Def.'s Br. [67] at 15.)   Defendant misapprehends, or mischaracterizes, the basis of plaintiff's retaliation claim.   Plaintiff clearly asserts in several paragraphs of his Complaint that Ivers "requir[ed] [employees] to put in more than forty hours for no pay," and that he objected to this policy, which he reasonably believed was illegal under the FLSA.   (Compl. [1] at ¶¶ 9-13.)   There is evidence in the record that supports, and other evidence that refutes, plaintiff's theory; but the nature of that theory is apparent even from a cursory review of the Complaint, plaintiff's deposition, and other testimony in the record.[3]

---

[3]   There is additional evidence, mostly in the form of e-mails, that suggests that plaintiff also objected to plaintiff's

Plaintiff has presented evidence that Ivers required hourly, non-exempt employees to work overtime, but refused to allow them to bill for more than forty hours a week.   Furthermore, plaintiff has presented evidence that he opposed and complained about this practice, which he reasonably believed violated the FLSA.   The evidence in the record is sufficient to raise a question of fact concerning whether plaintiff engaged in "protected activity" as required to assert a retaliation claim under the FLSA.

> **b.   Plaintiff has presented sufficient evidence that his termination was causally related to his protected activity to survive summary judgment.**

In order to prevail on his retaliation claim, plaintiff must demonstrate the requisite causal connection between his protected activity and his termination.   *Clover,* 176 F.3d at 1354.   To establish that causal connection, plaintiff "need only show 'that [his] protected activity and [his termination] were not wholly unrelated.'" *Id.* (quoting *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir. 1985).)   At a minimum, plaintiff must establish that the corporate agent who decided to terminate him was

---

attempt   to   re-classify   the   recruiters   as   exempt,   salaried employees.   In this case, however, plaintiff has consistently asserted his complaints about Ivers' failure to pay overtime to hourly, non-exempt employees as the basis of his retaliation claim. (*See* Compl. [1] and Pl.'s Br. in Response to Def.'s Mot. for Summ. J. [93].)

15

"actually aware of [his] protected expression" when he was terminated. *Id.* (citing *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993).) *See also, Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997) ("Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action."). The relevant agent's awareness of protected activity, in conjunction with temporal proximity of termination to protected conduct, is sufficient to raise a material issue of fact on the causal link requirement. *Goldsmith,* 996 F.2d at 1163-64.

Plaintiff has presented sufficient evidence to satisfy the standard announced in *Goldsmith.* First, there is no question that Ivers, the corporate agent responsible for plaintiff's termination, was aware of plaintiff's protected activity: plaintiff complained about her pay practices directly to her on several occasions, beginning in a meeting between plaintiff and Ivers on November 11, 2003. (PSMF [92] at ¶¶ 49, 53, 79.) Moreover, immediately prior to his termination, plaintiff made a similar complaint to Ivers' supervisor, Gary Melampy, who appears to have had some input in the decision. (*Id.* at ¶¶ 195, 200-203.)

AO 72A
(Rev.8/82)

Additional evidence in the record further supports plaintiff's theory that his termination was not "wholly unrelated" to his protected activity.  Plaintiff's testimony and supporting documents suggest that Ivers began criticizing plaintiff and questioning his managerial skills immediately after his first complaint about Ivers' pay policy.  (PSMF at ¶ 83.)   In his written statement to Melampy immediately prior to his termination, plaintiff stated that Ivers had been "gunning for [him] since [he] opposed her directive that sales recruiters not be paid overtime for the hours which they worked over 40."  (*Id.* at Ex. 14, p.3.)  Ultimately Ivers decided to terminate plaintiff's employment approximately a month after he raised his last complaint.  (*Id.* at ¶¶ 140-144.)

Other Unisource employees' testimony and statements tend to corroborate plaintiff's version of the events.  Human resources manager Yolanda Harris testified that Ivers "tried to find a way to end [plaintiff's] employment after he began complaining about her pay practices, specifically, her refusal to pay overtime pay to contract recruiters."  (Harris Aff. at ¶ 4.)  At her deposition, Harris stated that she believed Ivers felt that plaintiff "had to go" as a result of his complaints about Ivers' pay practices.[4]

_____

[4]  Harris' deposition testimony is more ambiguous than her Affidavit.  As defendant points out, the statements in Harris' deposition can be interpreted to suggest merely that Ivers resented plaintiff for opposing her effort to change the recruiters' status

AO 72A
(Rev.8/82)

(Harris Dep. at 182.)   Human resources director Virgil Bird similarly told plaintiff that Ivers would probably find a way to fire him if he did not follow her directives on overtime pay, even if those directives were illegal.   (PSMF at ¶¶ 96-99; Bird Dep. at 26-27.)   Although these statements may be open to different interpretations, they constitute circumstantial evidence of a causal link between plaintiff's protected activity and Ivers' decision to terminate him.

There is no question that Ivers, the corporate agent who decided to terminate plaintiff, was aware of plaintiff's protected activity.   Plaintiff has also produced evidence, including temporal proximity, his own testimony and supporting documents, and the testimony of other Unisource employees, that tends to show that his termination was not "wholly unrelated" to his protected activity. Accordingly, he has raised a question of material fact on the causal link element of his retaliation claim.

### 2.   Defendant's Legitimate, Nonretaliatory Reasons

As plaintiff has established a *prima facie* case of retaliatory discharge, the burden of production shifts to defendant to

_____

to exempt, or for his resistance to other practices that had nothing to do with the overtime issue.   (Def.'s Reply in Supp. of its Mot. for Summ. J. [108] at 9.)   That Harris' testimony is open to different interpretations merely highlights the remaining factual issues on the causal link question.

articulate a legitimate, nondiscriminatory reason for his termination. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253. Defendant asserts two non-discriminatory reasons for terminating plaintiff: 1) plaintiff's negative or otherwise inappropriate interviews with Unisource candidates Green and Rearic and Unisource employees Beaty and Myrick; and 2) plaintiff's "poor decision-making ability" and "inability to think strategically." (DSMF at ¶¶ 79-80.)

Unisource candidate Green has testified that his interview with plaintiff was "the worst interview experience" he ever had, and that he complained to Ivers about plaintiff's conduct during the interview. (Green Aff. at ¶ 3.) Ivers' testimony generally supports defendant's theory that she believed plaintiff's conduct during the Green interview was inappropriate and unprofessional, and that the interview was grounds for plaintiff's termination. (Ivers Aff. at ¶ 42.) Ivers' testimony and supporting documents also suggest that she had concerns about plaintiff's managerial skills and his ability to make decisions independently, which contributed to her decision to terminate his employment. (*Id.* at ¶¶ 20, 22-26, 36-38.) The Court thus finds that defendant has met its "exceedingly light burden" of articulating a legitimate, non-discriminatory reason for plaintiff's termination. *See Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

AO 72A
(Rev.8/82)

### 3.  **Pretext**

At this stage, to survive summary judgment, plaintiff must present evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by defendant were not the real reasons for his termination, but merely a pretext for retaliation. *See Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004). Plaintiff may demonstrate pretext "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256.  Plaintiff contends that there is sufficient evidence in the record to create a triable issue of fact that defendant's articulated  reasons for his termination were pretext for retaliation.  (Pl.'s Br. in Response to Def.'s Mot. for Summ. J. ("Pl.'s Br.") [93] at 16.)  The Court agrees.

The first reason defendant asserts for plaintiff's termination is his allegedly unprofessional and inappropriate conduct while interviewing Unisource candidates Green and Rearic and Unisource employees Beaty and Myrick. (Def.'s Br. [67] at 21-22; Def.'s Reply in Supp. of its Mot. for Summ. J. ("Def.'s Reply") [108] at 10, n. 7.)  The evidence concerning these interviews is in dispute. Although Green testified by affidavit that his interview with plaintiff was "the worst interviewing experience he ever had," his

20

deposition testimony is more ambiguous.  The most offensive conduct Green identifies in his deposition is plaintiff's correcting a spelling error on Green's resume, probing Green about his skill set, and questioning Green about his job history, specifically, why Green's resume reflected that he had held seven jobs in the past seven years.  (Green Dep. at 27-28.)  Regarding plaintiff's interviewing style, although Green testified that plaintiff was "rude," he also explained that he himself was "immediately agitated" before the interview even began because he noticed that plaintiff had made some red marks on his resume.  (*Id.* at 32.)  Complicating the issue, it is difficult to determine what actually occurred during the interview because Green became irate and stormed out of his deposition after approximately 30 minutes.  (*Id.* at 40.)

Likewise, it is not clear exactly what Green reported to Ivers about the interview.  Green apparently was offended and complained to Ivers about plaintiff, but the specifics of his complaint are difficult to determine, in part, again, because of his failure to complete his deposition.  (Green Dep. at 40.)  Construing the facts most favorably to plaintiff, Green informed Ivers that plaintiff had corrected a misspelled word on his resume, probed him about his skill set and whether he was appropriate for the position, and questioned him about why he had held so many jobs in a relatively short period of time.  (*Id.* at 28-29.)  Assuming plaintiff's version

21

of the facts is true, Ivers' claim to have terminated plaintiff as a result of the Green interview is open to doubt, particularly as it does not appear that plaintiff had ever received any complaints about interviews, or any other performance issues, during his entire two-year employment with defendant. (*See* Melampy Dep. at 19, 34.)

The evidence concerning the Rearic, Beaty, and Myrick interviews is even more contradictory. Rearic has filed an affidavit on behalf of plaintiff, stating that he "liked" plaintiff, and never complained about his interviewing style. (Rearic Aff. at ¶¶ 3,4.) Although Myrick submitted affidavits characterizing plaintiff's interviews as negative, he stated in his deposition that the interview was long, but not necessarily bad. (Myrick Aff. at ¶ 4; Myrick Dep. at 31.) Beaty similarly testified in her deposition that plaintiff's interviewing style was aggressive, but not negative, and that she never complained about the interview. (Beaty Dep. at 11-13, 16.) As a result of the conflicting testimony, Ivers' claim to have terminated plaintiff as a result of the Rearic, Myrick, and Beaty interviews may also be "unworthy of credence." *Burdine,* 450 U.S. at 256.

The second reason defendant asserts for plaintiff's termination is his alleged lack of managerial skills, specifically, his inability to "make decisions, think strategically, and lead the team." (Def.'s Br. [67] at 22.) Ivers' testimony supports the fact

22

that plaintiff lacked the necessary managerial skills to perform his
job.  (Ivers Aff. at ¶¶ 20-23.)  However, the testimony of other
Unisource employees contradicts Ivers' stated reason for terminating
plaintiff.  Several Unisource employees testified that plaintiff was
a good manager, and that his termination surprised other employees
and managers.  (*See* Harvey Dep. at 47; Ciminillo Dep. at 30-31;
Flor-Setzer Dep. at 91-92; Beaty Dep. at 25.)  Moreover, it does not
appear from the record that plaintiff was ever counseled or
disciplined about these issues, or even that he had received any
similar complaints during his two-year employment.  (*See* Melampy
Dep. 19, 34, Ex. 15.)  In contrast, Ivers, herself, was put on an
"action plan"--as opposed to being immediately fired-- after her
supervisor noted several problems with her performance and areas in
which she needed to improve her managerial skills, including
personal accountability, professionalism, and leadership.  (*Id.* at
Ex. 17.)  Finally, plaintiff presents evidence that Ivers'
statements that he was not "thinking strategically" directly
followed his complaints about her pay practices, further
discrediting her stated reason for terminating plaintiff.  (PSMF at
¶ 58, 65.)

Viewing all the evidence in the record in the light most
favorable to plaintiff, the Court concludes that plaintiff has
raised a triable issue of fact on pretext.  The Court is always

23

mindful that it is not "a super-personnel department." *Elrod v.
Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).
Nevertheless, in this case, plaintiff has presented enough evidence
for a reasonable jury to disbelieve defendant's proffered reasons
for terminating plaintiff.    Disbelief of defendant's proffered
reasons, coupled with plaintiff's *prima facie* case, is sufficient
for inferring discrimination. *Reeves v. Sanderson Plumbing Prods.,
Inc.*, 530 U.S. 133, 148 (2000); *Wilson v. B/E Aerospace, Inc.*, 376
F.3d 1079, 1091 (11th Cir. 2004).

That defendant's explanation for its termination decision is
impeachable does not necessarily mean that the true reason was
retaliation.    There is some evidence in the record that plaintiff
acted inappropriately during the Green interview, and that he did
not always act proactively and independently.    Thus, defendant may
well prevail at trial.    At this juncture, however, the Court
concludes that plaintiff should survive defendant's motion for
summary judgment.    Accordingly, defendant's motion for summary
judgment on plaintiff's FLSA retaliation claim should be **denied.**

## II.  Plaintiff's Motion for Contempt

As discussed, plaintiff's allegedly negative interview with
Unisource candidate Raja Green is one of the primary reasons
defendant asserts for terminating plaintiff. (*See* Def.'s Br. [67]
at 11.)  Accordingly, plaintiff subpoenaed Green for his deposition.

AO 72A
(Rev.8/82)

(Pl.'s Mot. for Contempt [63] at Ex. C.)  Green appeared for his
deposition on March 11, 2005.  (*Id.* at Ex. A.)  Approximately 30
minutes into plaintiff's questioning, Green became agitated and
stormed out of the deposition, refusing to continue his testimony.
(*Id.*)  In his motion for contempt, plaintiff requests that the Court
require Green to reappear for his deposition, and to pay the costs
associated with reconvening the deposition and filing the motion for
contempt.[5]  (*Id.*)

Federal Rule of Civil Procedure 45(e) provides that:

> Failure by any person without adequate excuse to
> obey a subpoena served upon that person may be
> deemed a contempt of the court from which the
> subpoena issued.

FED. R. CIV. P. 45(e).  The subpoena and deposition notice required
Green to attend the deposition "until its completion."  (Pl.'s Mot.
for Contempt [63] at Ex. C.)   Green was not authorized to
unilaterally end his deposition prior to its conclusion simply

---

[5]   The Court rejects defendant's argument that plaintiff's
motion for contempt is untimely because it was filed after the
close of discovery.  (*See* Def.'s Response to Pl.'s Mot. for
Contempt [66] at 3.)   The parties agreed to schedule Green's
deposition on March 11, 2005, outside the discovery period, in part
to accommodate Green's travel plans.  (*Id.* at 6.)   Obviously,
plaintiff could not have filed the motion until the deposition
occurred.   The Court finds that by agreeing to schedule Green's
deposition outside the discovery period, defendant also agreed to
allow plaintiff a reasonable time in which to file motions
responding to events that occurred during the deposition.
Plaintiff filed the motion within ten days of the deposition, which
the Court finds is reasonable.

because he became agitated and lost his temper.

In fairness to Green, however, it appears from the transcript that he only became angry after plaintiff's counsel repeatedly asked him whether anyone at Unisource told him that he was "a lousy candidate" for the position for which he had interviewed. (Green Dep. at 38-39.)  There was absolutely no evidence in the record to support this line of questioning.   In fact, Green had already testified several times that no one at Unisource had ever indicated that he was not a good candidate for the position.  (*Id.* at 13-14.) Although plaintiff's counsel correctly asserts that she is allowed to ask difficult questions, she is not allowed to repeatedly ask questions that have no basis in the record.  *See* FED. R. CIV. P. 30(d)(4)(authorizing a motion to terminate a deposition upon a showing that the examination is being conducted "in such manner as unreasonably to annoy, embarrass, or oppress the deponent").  Indeed, plaintiff's counsel now acknowledges that she was "confusing Mr. Green with another matter when she asked him some of her questions regarding how others perceived his candidacy."  (Pl.'s Reply [81] at 10.)  Plaintiff explains that she had just concluded four days of depositions in another case and that she was "shaken by the tragic events at the Fulton County Courthouse that occurred that morning."  (*Id.* at n. 3.)  Nevertheless, her inappropriate line of questioning appears to have contributed to Green's volatile

26

reaction.

Moreover, it appears from the transcript that plaintiff's counsel could have done more at the time of the deposition to resolve the dispute.  Defense counsel repeatedly asked plaintiff's counsel to participate in a call to the Court to determine whether her line of questioning was appropriate, but plaintiff's counsel refused to participate, threatening to file a motion for contempt unless Green returned to the deposition, where she intended to "continue asking [her] questions in the manner in which [she] was doing."  (Green Dep. at 41-42.)  The Court agrees with defendant that if plaintiff's counsel had relented in her inappropriate line of questioning or made additional efforts to resolve the dispute at the deposition, in all likelihood it would have been unnecessary for counsel to file this motion for contempt or to reconvene Green's deposition.

Considering all of the circumstances, the Court concludes plaintiff's motion for contempt should be **GRANTED in part** and **DENIED in part**.  The Court will require Green to appear for the conclusion of his deposition, but not to pay for any costs associated with the deposition or with plaintiff's motion for contempt.  Plaintiff should work with Green and defense counsel to schedule and conduct the deposition in the most efficient manner possible.

In his Reply brief in support of his motion for contempt,

27

plaintiff requests sanctions against defense counsel for refusing to withdraw its response to plaintiff's motion for contempt. (*See* Pl.'s Reply [81].)   In support of his request, plaintiff contends that:  1) defense counsel does not have standing to file a response to plaintiff's motion for contempt against a non-party witness whom it does not represent; and 2) defendant has made factual misrepresentations in its Response. (*Id.*) According to plaintiff, sanctions are appropriate because plaintiff's counsel advised defense counsel of these issues and warned defendant to withdraw its response to the motion.   Specifically, plaintiff's counsel sent defense counsel a letter stating:

> Withdraw your response immediately or we will seek sanctions against you, personally, as well as against your client, pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent powers.  I hope I have made myself clear.

(*Id.* at Ex. 3.)

Unfortunately, this letter--and the hostility apparent at the Green deposition--is characteristic of the manner in which the attorneys have conducted this litigation.[6]   That said, there is no

---

[6]   The attorneys for both sides have contributed to the unnecessarily contentious nature of this litigation, as evidenced by both attorneys' repeated requests for sanctions. The attorneys' uncooperative conduct is further evidenced in the deposition transcripts, which are difficult to read as a result of constant, and frequently groundless, objections, as well as long and quarrelsome discussions between the attorneys involved.

AO 72A
(Rev.8/82)

basis for plaintiff's counsel's threat to defense counsel to "withdraw the response immediately." The Court does not find that the response contains any misrepresentations. Moreover, defendant has a legitimate interest in the outcome of the motion for contempt, and thus has standing to oppose it. *See Harris v. Evans,* 20 F.3d 1118, 1121 (11th Cir. 1994)(noting that the "central purpose" of the standing requirement is "to ensure that the parties before the court have a concrete interest in the outcome of the proceedings such that they can be expected to frame the issues properly"). Accordingly, plaintiff's request for sanctions should be **DENIED**.

## III. Plaintiff's Motion for Sanctions

In a separate motion, plaintiff requests sanctions as a result of defendant's alleged "payment" for Amy Ivers' testimony pursuant to a cooperation clause in Ivers' severance agreement. (Pl.'s Mot. for Sanctions [84].) As discussed, defendant hired Ivers as its Director of Talent Acquisition in September, 2003. (DSMF at ¶ 16.) Defendant terminated Ivers' employment on September 30, 2004. (Def.'s Response to Pl.'s Mot. for Sanctions [107] at 3.) On November 1, 2004, Ivers and defendant entered into a Severance Agreement ("the Agreement"). (*Id.*) Pursuant to the Agreement, defendant paid Ivers four weeks' salary ($10,047.26) in exchange for her promise to: 1) release defendant from liability for any claims she might have against the company; 2) refrain from applying for re-

29

employment with the company; and 3) cooperate with the company in connection with any claims brought against it, including making herself available for interviews, depositions, and other proceedings. (*Id.* at Ex. C.)  The cooperation clause, the basis for plaintiff's motion, specifically provides:

> You agree that you will cooperate with the Company upon its reasonable request, in connection with any claims, lawsuits or other actions brought by or against the Company about which you may have knowledge, information or expertise or if the Company reasonably believes that your cooperation in connection with such claim, lawsuit or other action would be beneficial. Such cooperation shall include being available for interviews by the Company and/or their respective counsel, reviewing and/or identifying relevant documents, giving deposition testimony and/or testifying at any proceeding.

(Pl.'s Mot. for Sanctions [84] at Ex. 1.)

Plaintiff contends that the cooperation clause evidences defendant's "payment" for Ivers' testimony in this case. (*Id.* at 2.)  According to plaintiff, defendant's payment to Ivers in exchange for her agreement to cooperate with defendant in this and other ongoing litigation constitutes "witness tampering," and violates the "gratuity provisions" of 18 U.S.C. § 201(c).  (*Id.*) Plaintiff urges the Court to sanction defendant for its payment to Ivers under the Agreement. (*Id.*)  Specifically, plaintiff asks the Court to strike defendant's Answer or, alternatively, to strike Ivers' testimony and at trial inform the jury that defendant's

30

conduct in entering into the cooperation clause was improper and unethical. (*Id.*) The Court is not inclined to do either.

As an initial matter, Ivers testified that she provided testimony in this case because she wanted to defend her actions, not because defendant paid for her testimony. (Ivers Dep. at 119.) The record contains no evidence to the contrary.[7] Moreover, Ivers submitted her Affidavit testimony on September 27, 2004, prior to entering into the Agreement with defendant. (Ivers Aff. at 23.) The only other testimony Ivers has provided in this case is her deposition testimony. Ivers appeared at her deposition pursuant to *plaintiff's* deposition notice and subpoena, as opposed to defendant's directive. (*See* Ivers Dep. at 3.) Under the circumstances, there simply is no evidence to support plaintiff's argument that defendant has improperly, or indeed as plaintiff suggests illegally, "paid for" Ivers' testimony in this case.

The fact that Ivers' severance agreement contains a cooperation clause does not mandate a different result. The cooperation clause merely requires that Ivers make herself available to provide information and testimony concerning facts about which

---

[7]   Although the selected excerpts from Melampy's deposition that plaintiff cites in his brief, when read in isolation, might suggest that defendant "paid" Ivers to provide testimony, a fair reading of Melampy's entire deposition does not support plaintiff's theory.

she has knowledge as a result of her employment with defendant. (Pl.'s Mot. for Sanctions [84] at Ex. 1.)  By its terms, the clause does not seek to dictate the nature, or improperly influence the content, of Ivers' testimony.  (*Id.*)  Indeed, the clause appears to be a routine provision designed to ensure defendant's access to former employees with relevant knowledge about ongoing litigation. Courts have upheld similar cooperation clauses in other contexts. *See Martin v. Traveler's Indem. Co.,* 450 F.2d 542, 553 (5th Cir. 1971) (explaining that "[c]ooperation clauses are intended to guarantee to insurers the right to prepare adequately their defenses on questions of substantive liability")[8] and *In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999,* 191 F.3d 173, 180 (2d Cir. 1999) (enforcing former employees' cooperation clauses but explaining that such clauses do not implicitly waive Fifth Amendment rights).  Moreover, the Eleventh Circuit has rejected plaintiff's argument that such clauses, in the absence of an attempt to procure false testimony, violate 18 U.S.C. § 201(c).  *See United States v. Moody,* 977 F.2d 1420, 1425 (11th Cir. 1992) (interpreting Section 201(c) to proscribe bribes for false testimony), and *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,* 117

---

[8]   Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/82)

F.3d 1328, 1335, n. 2 (11th Cir. 1997) (clarifying that Section 201(c) is only implicated by payments that constitute a bribe for false testimony).

After a thorough review of the record, including the terms of the cooperation clause, the Court has found no evidence to suggest that defendant improperly "paid for" Ivers' testimony. Accordingly, plaintiff's motion for sanctions should be **DENIED**.   At the same time, it does not appear that plaintiff asserted his motion in bad faith.   Consequently, defendant's request for sanctions, made in response to plaintiff's motion, should also be **DENIED**.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** defendant's Motion for Summary Judgment [67], **GRANTS in part** and **DENIES in part** plaintiff's Motion for Contempt [63], **DENIES** plaintiff's Motion for Sanctions [84], **GRANTS** defendant's Motion for Leave to File Sur-Reply [85], and **DENIES** defendant's Motion for Sanctions and for Oral Arugment [107].

SO ORDERED, this ___/___ day of February, 2006.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)